Thomson, J.
In the latter part of the year 1888, the town, afterwards city, of Grand Junction, entered into a contract with N. J. Krusen for the construction and operation of a system of waterworks. An ordinance, adopted by the board of trustees of the town, on the 23d day of November, 1888, and the acceptance by Krusen of its terms and conditions, consti *427 tuted the contract. The provisions of the ordinance, in so far as they have any bearing upon the present controversy, are as follows:
“ Be it ordained by the board of trustees of the town of Grand Junction, state of Colorado:
“ Section 1. That N. J. Crusen, of Larned, Pawnee county, Kansas, his associates, successors and assigns, be and is hereby granted, subject to the conditions, stipulations and requirements hereinafter contained, the right and privilege to erect, construct, operate and maintain, for the term of twenty-one years from the adoption of this ordinance, a system of waterworks in or adjacent to the town of Grand Junction, Mesa county, Colorado, for the supplying of said town and its inhabitants with water for domestic, sanitary and other uses,- and for the extinguishment of fires; and to that end shall have the right to receive, take and store, conduct and distribute water through the town'; to construct and extend aqueducts, mains and pipes, through all the streets, avenues, alleys and public grounds, as the same may now exist or may hereafter be extended.
“ Section 2. The general plan of said works shall be as follows : Two pumps of 1,400,000 U. S. gallons capacity in the aggregate every twenty-four hours, an engine house, built of either brick or stone; two boilers, and a stand-pipe not less than ten feet in diameter and not less than 100 feet in height above the level of the intersection of Fifth street and Grand avenue, in said town; the supply of water for said works to be obtained from the Grand river and to be of good quality, filtered or settled, and fit for domestic use. There shall be laid not less than four miles of steel, wrought or cast iron pipe, and not less than three and one half miles thereof shall be laid within the town limits, said pipe varying in size from four to ten inches, inside diameter; pipes to be laid not less than thirty-two inches below the surface of the ground; said works, when completed, shall be, and shall continue at all times to be, capable of discharging at the same time four one-inch streams, from any four hydrants, through *428 100 feet of two and one half inch rubber hose and one inch nozzle to a height of seventy-five feet in any part of the town, provided, that in making such tests, not more than two of the four streams shall be required to be thrown from hydrants on a dead end; and upon this test being satisfactorily made, and the -fulfillment of all other conditions, stipulations and requirements herein contained, the town shall become obligated to pay the hydrant rental hereinafter provided for.
“Section 3. The town of Grand Junction hereby agrees to rent and does rent fifty double-discharge, anti-freezing fire hydrants, to be not less than four inches, inside diameter, and agrees to pay each year for the use of the same and the use of water therefrom for the purpose of extinguishing fires, and flushing of gutters and sewers once a week, the sum of |3,250, payable semi-annually, at the town of Grand Junction, or the Chemical National Bank in the city of New York; and said N. J. Krusen, his associates, successors and assigns, in consideration of the above hydrant rental, shall furnish without further charge, water for all churches, public schoolhouses and public buildings, and shall also furnish water for and maintain free of charge, at such place as the board of trustees may designate, two public drinking fountains for man and beast.
“Section 4. In the event that said N. J. Krusen, his associates, successors and assigns shall issue bonds upon - said waterworks and the rights, privileges thereto' belonging, then at any time after the completion of said works and a satisfactory test has been made, the mayor and recorder shall, upon the request of said Krusen, his associates, successors or assigns, indorse upon said bonds a certificate that said waterworks have been completed and satisfactorily tested.”
“ Section 6. All hydrants erected and rented by the town in excess of the first fifty and under one hundred, shall be at an annual rental, not to exceed fifty dollars each, and the town shall pay such rental in full each year at the rates above mentioned, respectively. All hydrants shall be located at such places, or their location changed to such places, as shall *429 be designated by the board of trustees; and shall be so located or changed when and only when ordered by said board, provided the town shall pay all expenses of the change of location of any hydrant.”
“ Section 10. If at any time any portion of the mains in any part of said town or any hydrants, becoming frozen, bursted or otherwise out of proper condition, and in case written notice to the superintendent or other person in charge of said waterworks, or any such defect, signed by the mayor, or any officer of said town, having been given, then and in that case, if said defect shall'not be remedied within forty-eight hours after the receipt of such notice, the liability of said town shall cease as to all rental, from the giving of such notice, until such time as such mains or hydrants shall have been put in perfect condition. And in case of damage to any citizen or citizens by reason of such mains or hydrants being out of condition, and in case said company shall not forthwith proceed, from the time of the receipt of the aforesaid notice, to remedy any-such damage, and the amount of such damage having been ascertained, the board of trustees shall retain the amount thereof out of the annual rental due said waterworks company.”
On the 17th day of December, 1888, N. J. Krusen assigned all his right and interest in the contract to the Grand Junction Water Company, a corporation. In 1891, the town of Grand Junction became the city of Grand Junction. A system of waterworks was constructed by the water company, and, on the 7th day of August, 1889, a test was made of their capacity. Before the pipe was laid, objections, made to it by some of the citizens, were considered by the board of trustees of the town, at a meeting held on the 13th day of February, 1889. The following appears in the record of the proceedings at that meeting:
“ A petition signed by Marsh, Adams and others, praying that the board take some steps to prevent the water company from putting in the pipe scattered through the streets, was presented, read, and on motion ordered filed. Mr. *430 Réeves, of the water company being present, made a statement in regard to the pipe which they intend putting in, called Phipp’s Hydraulic Pipe, and also furnished the board several references of companies who are using the same; and the recorder was instructed to correspond with those parties with relation thereto.”
On the 12th day of September, 1889, the board of trustees adopted the following resolution :
“ Resolved, That in the opinion of the board of trustees of the town of Grand Junction, the Grand Junction Water Company, being the assignees of N. J. Krusen and his associates, have completed their system of waterworks in said town in accordance with their contract with the town and the ordinance passed November 23, 1888; and a satisfactory test having been made August 7, 1889, the mayor and recorder are requested and instructed to indorse on the bonds of said company, the fact that said works have been so completed and tested.”
Afterwards, on October 14,1889, April 22,1890, and May 5, 1890, the board adopted resolutions requiring the company to extend its mains along different streets, and erect new fire hydrants. The extensions seem to have been made as ordered. In making the extensions, the same character of pipe was used as at first. Payments were made by the city under the contract to the satisfaction of the company, until the. 7th day of February, 1891, after which date the city refused further payment, claiming that, by the company’s default, its .obligation was terminated.
On January 31, 1895, the water company brought this suit to recover the contract rentals of hydrants, from February 7, 1891, to February 7, 1895, amounting to $14,200. The complaint set forth the contract, and averred compliance with its terms on the part of the plaintiff, and the refusal of payment by the city. The answer, after denying performance, alleged that the plaintiff, instead of laying the pipes provided for in the ordinance, used cement pipes, of inferior quality, and unable to withstand the pressure necessary to *431 impart the force required by the contract in the discharge of streams of water; that instead of furnishing water of good quality, fit for domestic use, the plaintiff furnished water that was muddy, impure, offensive and dangerous, by which, also the pipes, valves and appliances used for irrigating and sprinkling purposes, were clogged. The answer further set up a resolution adopted by the city council on the 12th day of April, 1892, which, after reciting that the pipes required by the contract had not been laid, that the quality of the water furnished did not answer the agreement, and that the works were not capable of discharging the specified streams of water for protection against fire, declared the contract rescinded, and the franchise of the company forfeited. The replication, after denying material allegations of the answer, averred that the pipes were of steel, cemented within and without, that the coating of cement improved them, and adapted them better to the alkaline soil in which they were laid, and alleged the acceptance of the works by the defendant, with full knowledge of the character of the pipes, and the use by it ever since August, 1889, of water from the plaintiff’s works for all the purposes mentioned in the contract. The judgment was adverse to the plaintiff.
From the evidence it would seem that the pipes were either steel, or cast iron, lined with cement. There was expert testimony that cement-lined pipes are less liable to incrustation, and obstructions which would tend to impede the flow of water, than other classes of pipe, and that the capacity of these pipes was ample. But the defendant has es-topped itself to say that the material composing them' did not meet the requirements of the contract. Before they were put into place, they lay scattered upon the ground, open to the inspection of the defendant and the public. In response to some complaint of citizens, the board took the quality of the pipes into consideration. A representative of the water company met with them, and furnished them data to assist them in an investigation, and they directed their recorder to pursue his suggestions. This was on the 13th day of Feb *432 ruary, 1889. Seven months afterwards, on the 12th day of September, 1889, they adopted a resolution, reciting that the company had completed the works in accordance with the contract, and that a test had been made which was satisfactory ; and instructing the mayor and recorder to indorse upon the bonds of the company a certificate that the works were completed and satisfactorily tested. The defendant had ample time for the severest investigation. As an investigation was courted and directed, presumptively it was made, and the adoption of this resolution, not only approving the works as fulfilling the contract, but directing such action by the mayor and recorder in pursuance of the provisions of the original ordinance, as would assure purchasers that the bonds might lawfully be issued and sold, is conclusive upon the city that, in the matter of the pipes, there was a literal compliance with the terms of the contract.
There was evidence of an occasional bursting of the pipes, causing, perhaps, a temporary impairment of the ability of the works to throw water to the required height, but the fact of such bursting cannot be used in this case for any purpose. The liability of the pipes to burst was contemplated by the parties when the contract was made, and section 10 of the ordinance provided for emergencies of that character. In the event of accident to the pipes, it was made the duty of the company, within forty-eight hours after receiving notice of their condition from the city, to repair them, and the consequence of its failure so to do, would be the deduction from any indebtedness of the city to it, of all rentals from the time of notice to the time of repair, and all damages sustained by individuals, and caused by the condition of the pipes, which had been ascertained by the city. This section is a modification of the requirement of section 2 that the works should, at all times after completion, be capable of discharging a certain number of streams to a certain height. Accident to the pipes, of such a nature as to disable the plant from performance of the requirement, could not be charged against the company as a violation of its contract, and would not affect *433 its right to the full agreed compensation for the use of its hydrants, unless, within forty-eight hours after notice, it failed to restore conditions, and the only penalty for its failure would be deductions for rentals and damages. If these pipes were at any time broken, or in bad repair, and the proper notice was given and disregarded, the facts might have been pleaded, and the rentals and damages accruing during the default set off against the plaintiff’s claim. But the answer said nothing upon the subject. By reason of the action of the defendant in accepting the works, its subsequent orders concerning the pipes, and the nature of the defense it has interposed, there is no question in the case of the character of the pipes as laid, or their condition afterwards.
We find nothing in the record to indicate that water was not at all times supplied in abundance, or that the city ever declined to use it. It was obtained from wells sunk "close to the Grand river, and down to the rock below the bed of the river. Upon this rock was a stratum of gravel, through which the water of the river made its way to the wells. There were three of these wells, each of which was designated in the evidence by a number. Well No. 1 was sunk when the works were completed. Well No. 2 was constructed in March or April, 1891, and well No. 3 afterwards. Filtering galleries were connected with the wells. After the construction of wells Nos. 2 and 3, the water furnished was taken mostly, if not entirely, from them. The contract required the water to be obtained from the Grand river, to be of good-quality, filtered or settled, and .fit for domestic use. The water came from the Grand river, and before delivery to the city, passed through a bed of gravel. In relation to this gravel, Charles N. Cox, a hydraulic engineer of considerable experience, testified as follows :
“ This natural gravel is as good a natural filter as we have; it is what is ordinarily used in all filters of that class. There is no filter on a large scale that is much better. It is the filter in common use throughout the country, when required on a large scale.”
*434 As to the filtering qualities of the gravel, we do not find that any witness disagreed with him. There was, therefore, a compliance with the contract by the company in these two respects, — that the water was taken from the Grand river, and that it was filtered. Respecting the quality of the water, it was shown by a number of witnesses, who were residents of Grand Junction, and who had used the water from the beginning, that when the Grand river was high and turbid, the water was discolored because the pressure from the river forced it rapidly through the gravel, but that as a rule, it was quite clear and good. The defendant produced witnesses who testified to the occasional muddy appearance of the water, caused by the condition of the river. They also stated that the water was hard and had to be broken for washing purposes. ..Professor Chauvenet, president of, and professor of chemistry in, the Colorado School of Mines, who had made an analysis of the water for the defendant, and who testified in its behalf, stated that if the hardness of the water could be relieved, it would be a very good water supply. He also analyzed water from the river, and found a certain degree of hardness in it. A practicing physician of Grand Junction, who was a witness for the defendant, testified that he judged from the appearance of the water as he had seen it, that it would be unwholesome; that his opinion was formed only from its appearance, for he had never analyzed it, and did not know its ingredients, but that he was not aware of having prescribed for any disease caused by the water, and could not trace any disease to its use.
Upon this question of the quality of the water furnished, a close comparison of the testimony of the witnesses for the plaintiff, with that of the witnesses for the defendant, does not disclose, so far as statements of fact are concerned, any substantial disagreement, and to estimate the effect of the evidence upon the case, we must go to the contract. The obligation to which the plaintiff can be held, and the measure of its duty and liability, must be found there.
Now the contract required that the water should be of good *435 quality, and fit for domestic use, but it also required that it should be taken from the Grand river, and filtered or settled. In supplying the city, the plaintiff was confined to such water as the Grand river would furnish, and to determine what was meant by the terms “ good quality,” and “ fit for domestic use,” the source from which it should come must be considered. As it must come from the Grand river, the parties obviously intended only that the water should be of as good quality, and as fit for domestic use, as, by filtering or settling, could be obtained from that river. The water was filtered, and when the condition of the river at different times, and from different causes, and the corresponding effect upon the filtering material, are considered, we find it difficult to discover in the evidence any reason for believing that the water, which the plaintiff supplied, did not come up to the standard fixed by the contract.
We come now to a consideration of the evidence concerning the capacity of the plant to project the streams of water required by the contract, and this furnishes the question over which the contest is the hottest and most sustained. The witnesses for the plaintiff concurred in the statement that the works were at all times capable of discharging simultaneously four one inch streams from any four hydrants, through 100 feet of two and one half inch hose, and one inch nozzle, to a height of seventy-five feet, not more than two to be thrown from hydrants on a dead end. The original test in the presence of the city officials, other tests made by the company for its own satisfaction, and results at fires, all indicating the capacity of the works to fufill the requirement, .were proven. To negative the assertion of the continued ability of the works to throw these streams, the defendant introduced several witnesses, who testified to failures on different occasions, at fires, to obtain streams of near the required height. The evidence was that the company had held a force in reserve to be applied in cases of.'fire, and the use of which was unnecessary, and perhaps undesirable, for the ordinary purposes of the city. It always put this force *436 in operation when notified of thé existence of a fire. The only method provided by the city for giving notice of a fire, was the ringing of a fire bell at a considerable distance from the works; whether it could be heard at the works, depended on the direction of the wind; sometimes it was heard, and sometimes it was not; and an attempt to throw water when the company had no opportunity to apply the requisite extra force, would not be a fair test of the capacity of the works. But aside from this, there is a weakness in the defendant’s evidence, which destroys its value as a factor of disproof. The evidence, introduced by the plaintiff of the ability of its works, cast the burden upon the defendant, and in proving the tests upon which it relied, it was incumbent upon it to show that they were within the conditions specified in the contract, beyond which no obligation rested upon thé company. Only in three instances was the length of the hose, through which the stream was projected, given. One of the lengths was from 150 to 200 feet, another, about 360, and another, about 400 feet. The length of hose through which the company bound itself to be able to discharge a volume of water seventy-five feet high was 100 feet, and not only was the length of hose specified, but its size, and the size of the nozzle. It did not contract to send streams through more than 100 feet. The force sufficient for that length, would, by reason of the additional friction, fail at a greater distance. A test made through 400 or 360 or 150 feet, would be absolutely worthless. To prove a want of ability in the works, which would amount to a failure of compliance with the contract, not to exceed 100 feet of two and one half inch hose, with a one inch nozzle, must be used, and evidence not showing affirmatively tests made under contract conditions, would be no proof at all. The testimony of the defendant’s witnesses, not exhibiting a failure in anything the plaintiff was bound to perform, rebutted nothing. It did not conflict in the least with the proof made by the plaintiff. The capability of the plant was demonstrated by the first test, which was witnessed by the city officials, and approved *437 by them. It is presumed that what it did once, it could, under the same general conditions, do again, but there was no evidence of any change in the general conditions, so that the plaintiff had in its favor not only the legal presumption, but the actual proof, of its ability to do what it had agreed, and the defendant left both presumption and proof undisturbed. Upon a careful survey of the entire evidence, we are unable to see wherein there was not at least a substantial compliance by the plaintiff with the terms of its contract, both in the furnishing of the water, and the continued capacity of the plant.
Upon the rendition of the verdict, the plaintiff unsuccessfully moved for a new trial, upon the ground, among others, that the evidence was insufficient to justify the verdict. We are strongly inclined to the opinion that the motion should have been sustained upon that ground, but we do not feel called upon at this time to so decide, because an error, concerning which we are not troubled by doubt, necessitates a reversal of the judgment. However well satisfied the jury may have been that the plaintiff had performed all the requirements of the contract, an instruction was given them, which, if they followed it, and we must presume that they did, rendered a verdict for the. plaintiff impossible. The court laid down three conditions by which, it was asserted, the plaintiff was bound, and a concurrence of which was necessary to entitle it to a recovery. The first and second we pass without comment. The third was as follows: To “ maintain, at all reasonable times, a pressure for the distribution of water through its system sufficient to discharge a one-inch stream from either of said hydrants through 100 feet of two and one half inch rubber hose and one-inch nozzle to a height of seventy-five feet, and a system capable of discharging at the same time not exceeding four of such streams from any four hydrants, no more than two of which shall be required 'to be thrown from hydrants on a dead end.”
There was nothing in the contract which required the company to maintain any specified pressure, and it made no *438 pretense that it maintained a pressure sufficient uo discharge a stream of water of any size to any height. Its works were required to be capable at all times of exerting a pressure sufficient to throw, under certain specified conditions, four streams of water to the height mentioned in the instruction, but the ability to exert the pressure when necessary, and the actual maintenance of the pressure, are two entirely different things. The proof showed the continued requisite capacity, except, perhaps, when the pipes were temporarily disabled, and for accident to the pipes, the contract made provision. With the modification which that provision introduced into the contract, it would not be inaccurate to say that the works ■ must, at all reasonable times, be capable of discharging a certain amount of water with a certain force, the reasonable times being those when the pipes were in proper condition for the purpose, and by the use of the words “reasonable times ” in the instruction, the court must have meant those times, or it meant nothing. It seems clear that the ordinary pressure which was constantly maintained was sufficient for the common uses of the city and its inhabitants, and that the provision requiring a capacity for the exertion of a greater force, was intended solely as a protection against fire. But the requirement was, not that this force should be maintained, but that it should, at all. reasonable times, be within the capacity of the plant, to be sent out when called for. As the instruction compelled the jury, before they could give the plaintiff their verdict, to find that it did something which it did not do, which it did not pretend to do, and which it was not required to do, the result was inevitable, and the case which the plaintiff made was not, and could not be, considered by them.
An objection is taken to the complaint which cannot very well be understood without a reference to the statute by which the contract was authorized. Subdivisions 69 and 71 of section 3312 of the General Statutes, which contained the law in force at the time the contract was made, provided as follows:
*439 “ When the right to build and operate such water or gas works is granted to private individuals or incorporated companies by said cities and towns, * * * such cities or towns are authorized and empowered to enter into a contract with the individual or company constructing said works, to supply said city or town with water for fire purposes, and for such other purposes as may be necessary for the health and safety thereof, and also with gas, and to pay therefor such sum or sums as may be agreed upon between said contracting parties.”
“ If the right to build, maintain and operate such works is granted to private individuals or incorporated companies •by such cities or towns, and said cities or towns shall contract with said individuals or companies for a supply of water or gas for any purpose, such city or town shall levy each year and cause to be collected a special tax as provided for above, sufficient to pay off such water or gas rents so agreed to be paid to said individuals or company constructing said works; provided, however, that said last-mentioned tax shall not exceed the sum of three mills on the dollar for any one year.”
Now it is said that the complaint is defective because it does not allege that the amount agreed to be paid per annum was within the amount which would be produced by a tax of three mills on the dollar. We do not think the objection tenable. The complaint set forth the ordinance which constituted the contract, and averred performance of its conditions by the plaintiff, and the failure of performance by the defendant. It contained all that was necessary in a statement of a cause of action upon a contract with mutual covenants. The presumption, in a case like this, is that the board of trustees acted lawfully, and that the amount agreed to be paid was within the limits prescribed by the statute, whatever those might be. If the defendant was of the opinion that the board had no power to contract for the payment of more than the amount which a three-mills tax would produce, and if the fact was that such tax would not produce the *440 amount agreed to be paid, the answer should have so alleged. On- its face the complaint was good, and, accepting for the present, the defendant’s construction of the statute, if, after the contract was made, it turned out that the proceeds of a three-mills tax was insufficient to meet the contract price, that fact should have been stated in the answer. It was matter of defense, to be alleged and proved by the defendant. But we are unable to acquiesce in counsel’s opinion of the meaning of the statute. The 69th subdivision provided for contracts of this character, and authorized the payment by the city or town of such sum or sums as might be agreed upon by the contracting parties. To the amount which the municipality might agree to pay, there was no limit fixed. It was matter of agreement between the parties concerned, and whatever they might agree upon, the city might lawfully contract to pay. This is the plain meaning of the language of subdivision 69, standing alone. Is that meaning in any way qualified by the terms of theTlst subdivision? The latter provided for the levy and collection, each year, of a tax sufficient to pay the amounts “ so agreed to be paid.” The words “ so agreed to be paid ” refer back to the authority contained in the 69th subdivision, which left the amounts to the unrestricted agreement of the parties. The intention was to provide a method by which the city might discharge its obligation. But the general provision is qualified by a special proviso that the tax should not exceed three mills on the dollar. While there was no limitation upon the amount in which the city might bind itself, there was a limitation upon the amount which, by means of a special tax, might be raised in any single year to be applied upon the debt. We find no reason in the law why the city might not make any deficiency good out of its general revenue. But be this as it may, .how the mere failure of the city for one year, or a series of years, to collect enough money to discharge a just and lawful obligation, could operate to extinguish its liability upon the obligation, either in toto or pro tanto, has not been satisfactorily shown to us. The position of coun *441 sel requires the establishment of one of two propositions: either, first, the obligation of the city could not lawfully be fixed in the contract at an amount which should in any one year exceed what the special tax for that year would bring; or, second, the parties might agree upon an amount certain without reference to any tax general or special, but if in any year the proceeds of the tax should be less than the agreed amount, they must, nevertheless, be received in full payment. Respecting the first, to fix a sum which, while approximating the special tax receipts, would never exceed them, would require a foreknowledge, not possessed by any person we have yet encountered. The assessed valuation, and the consequent results, might, and probably would, vary from year to year; while the amount agreed upon might fit the tax in one year, it might be a misfit in another, and, if it should ever fail to fit, payment might be resisted on the ground that the contract was ultra vires. The second amounts to simply tliis, that a municipality may lawfully contract a debt which it would be unlawful to pay according to the contract. We hardly think a proposed investor, having a proper regard for his solvency, would care to risk his money upon such contingencies. Both propositions, when followed to their logical result, seem to us to end in absurdity.
In support of their objection, counsel have referred us to the case of Water Works Co. v. Town of Raton, 49 Pac. Rep. (N. M.) 598. There are two reasons why the decision in that case is not authority in this. First, the answer, unlike the answer interposed here, set up the facts necessary to raise the question of the power of the town to enter into the contract, and second, it does not appear from the opinion that the statute of New Mexico contained any provision corresponding to subdivision 69 of section 3312 of our law, giving to municipal corporations the unrestricted authority to enter into contracts for water supplies. The opinion does not purport to construe any such grant of power, and hence its reasoning is not applicable to the present case. •
The judgment will be reversed.

Reversed.